# Combs v. Shields' Executor et al.

(Decided Oct. 19, 1937.)

J. J. McBRAYER and RICHARD C. STOLL for appellant.

S. S. YANTIS for appellees Combs and Shields' executor and trustee.

STROTHER KISER for appellee Combs.

OPINION OF THE COURT BY JUDGE REES—Affirming.

This is an appeal from a judgment of the Fayette circuit court declaring a certain carbon copy of a writing dated November 25, 1933, to be a true copy of the last will and testament of Annie E. Shields, and adjudging such writing to be her last will. The appellant is the son and the only heir at law of the testatrix.

Annie E. Shields died December 29, 1934, the owner of real and personal property worth approximately $80,000; most of her property consisting of real estate located in Lexington, Ky. She was 82 years of age at the time of her death. Mrs. Shields first consulted Mr. Frank S. Ginocchio, an attorney of Lexington, Ky., in November, 1932, concerning certain changes she desired to make in her will which she had executed in 1926. She consulted him a number of times concerning the matter, and in November, 1933, he prepared, in accordance with her directions, a new will which she executed in his office on November 25, 1933. She left both wills with him for safe-keeping, and he put them in an envelope, sealed it, and put it in a safe in his office, where it remained until shortly before Mrs. Shields' death. The provisions of the two wills were substantially the same; only minor changes being made. When the new will was written, a carbon copy was made which Mr. Ginocchio retained in his possession, and it was this carbon copy which was offered for probate in lieu of the original which was alleged to have been lost. The will executed November 25, 1933, by Mrs. Shields provided for the payment of her debts and funeral expenses, and the erection of a mausoleum in the Lexington cemetery, and bequeathed to the Lexington Cemetery Company the sum of $500 in trust for the maintenance of the mausoleum and her burial lot. Any personalty remaining was bequeathed to her son, A. V. Combs, Sr. By clause 6 she devised to trustees named in the will a certain business building located on North Broadway street in Lexington, Ky., the same to be held in trust, and the net income therefrom to be paid to her grandson, A. V. Combs, Jr., for and during his life, and upon his death.

same was to be sold and the proceeds paid, share and share alike, to her three greatgrandchildren, Evelyn Combs, A. V. Combs III, and George Morrow Combs, children of A. V. Combs, Jr., providing George Morrow Combs, who was 10 years of age when the will was executed, should have arrived at the age of 21. If he had not attained 21 years of age at the death of his father, A. V. Combs, Jr., the property was to be held by the trustees as provided in clause 7 of the will. By clause 7 of her will she devised the remainder of her property in trust to her trustees; the net income therefrom to be distributed as follows: 60 per cent. to her son, A. V. Combs, Sr., during his lifetime; 25 per cent. to her three greatgrandchildren, Evelyn Combs, A. V. Combs III, and George Morrow Combs; and 15 per cent. to be held and used as an emergency fund in case of necessity for her son, grandson, and three greatgrandchildren. After the death of her son, A. V. Combs, Sr., if her grandson, A. V. Combs, Jr., survived him, 60 per cent. of the income was to be paid to her three greatgrandchildren; 25 per cent. to her grandson during his lifetime; and 15 per cent. was to be held and used as an emergency fund in case of necessity for her grandson and three greatgrandchildren. This clause of the will contained the following provision:

"The trust created in this clause of my will shall cease and terminate upon the death of my son, A. V. Combs, and if my youngest great-grandchild, George Morrow Combs, now aged ten, be then thirty years of age, or would have attained thirty years of age had he been living at the time of the death of my son, A. V. Combs."

It then provided, upon such termination of the trust, the trust property should be converted into cash and paid to her three greatgrandchildren, share and share alike. By clause 8 of the will, the testatrix nominated and appointed her son, A. V. Combs, and F. G. Stilz to be the executors and trustees thereof, and the Bank of Commerce was named to act as executor and trustee in the event both A. V. Combs and F. G. Stilz failed to act. After the death of Annie E. Shields, her son, A. V. Combs, filed a petition in the Fayette county court asking to be appointed administrator of her estate. Before this petition was acted upon, Mr. Ginocchio informed F. G. Stilz that he had prepared a will for Annie E. Shields, which she had executed, in which Stilz was

named executor, and that he had a carbon copy of the will. Stilz thereupon filed a petition in the Fayette county court in which he alleged that the last will and testament of Annie E. Shields, dated November 25, 1933, had been lost, and he set out the contents of the alleged lost will and asked that it be probated. Probate was refused, and Stilz appealed to the Fayette circuit court where the case was tried before a jury. The sole issue presented was whether or. not the testatrix had destroyed the will dated November 25, 1933, with the intention to revoke it. This issue was submitted to the jury, and it returned the following verdict:

"We the jury find that the paper read in evidence as a copy of the will made by Annie E. Shields on the 25th day of November, 1933, is in substance a true copy of a will made by the said Annie E. Shields and that she did not subsequently destroy, or order destroyed, the said will for the purpose or with the intention of revoking it and that the writing dated Nov. 25, 1933, is the last will and testament of Annie E. Shields."

From the judgment entered upon this verdict, A. V. Combs has appealed, and urges as grounds for reversal: (1) Error of the trial court in failing at the conclusion of all the evidence to instruct the jury peremptorily to find that the paper offered for probate was not the last will and testament of Annie E. Shields; (2) errors in the admission and rejection of testimony; and (3) misconduct of attorneys for the executor and guardian in their arguments to the jury.

It was conclusively shown that Mrs. Shields duly executed a will November 25, 1933, very similar in its provisions to a will which she had executed in 1926. In both wills she clearly evidenced her intention to provide for the maintenance and education of her three greatgrandchildren, and to give them the corpus of her estate after the deaths of her son and grandson. Great precaution was exercised to preserve the estate for their benefit. It is not contended that the paper offered in evidence, purporting to be a copy of the will, was not a true copy of the will executed by her. It is merely claimed that A. V. Combs, Jr., testified positively that he destroyed the will at. Mrs. Shields' direction and request, and that there is not any direct contradiction of his testimony. A careful reading of the record convinces us, not only that facts and circumstances contra-

dictory of his testimony sufficient to take the case to the jury and sustain the verdict were proved, but that they were so overwhelming that an honest and conscientious jury could have reached no other conclusion.

A. V. Combs, Jr., upon whose testimony appellant relies, was about 35 years of age at the time of his grandmother's death. He had been married twice, and each of his wives had obtained a divorce from him. By his first wife he had one child, the appellee Evelyn Combs, who was 17 years of age when Mrs. Shields died, and by his second marriage he had two children, the appellees A. V. Combs III, and George Morrow Combs, who were 15 and 11 years of age, respectively, when their greatgrandmother died. A. V. Combs, Jr., contributed little to the support and maintenance of his three children. Evelyn Combs testified that during her entire life he had given her only $20. Mrs. Shields paid for her board and tuition for four years at the Kentucky Female Orphan School at Midway, Ky., and furnished board, clothing, and school tuition to the two younger children. The testatrix was deeply attached to her three greatgrandchildren, and over a long period of years manifested a settled intention to preserve the corpus of her estate for their benefit. That she suddenly changed this intention a few days before her death is supported solely by the testimony of A. V. Combs, Jr. The testatrix was critically ill from September, 1934, until her death on December 29, 1934, and during most of that time was confined to her bed. Mr. Ginocchio testified that the testatrix left the will with him for safe-keeping, and that he put it in a safe in his office where it remained until November 20, 1934. A V. Combs, Jr., called at his office in September, 1934, and asked him what the will contained, but the witness refused to enlighten him and told him he would have to get that information from Mrs. Shields. On November 20, 1934, A. V. Combs, Sr., called at his office and asked for his mother's papers which Mr. Ginocchio had in his possession. Mr. Ginocchio told him that the only paper in his possession belonging to Mrs. Shields was her will, and that he would not deliver that to him, but would deliver it in person to Mrs. Shields. Later on that day he took the will from the safe and on the following morning drove to Mrs. Shields' home with the intention of delivering it to her, but was met at the door by a nurse who told him that Mrs. Shields was too ill to see him. He returned the will to the safe in his office. On De-

cember 6, 1934, A. V. Combs, Sr., again called at his office and asked for the will, and the witness again refused to deliver it to him, but said: "If Mrs. Shields is able to see and talk to me, I will take the will to her." He went to Mrs. Shields' home about 8 o'clock that night, and delivered to her the envelope containing the two wills. The envelope was sealed. When he handed it to her she said she wanted it in case anything happened to her. Mrs. Georgianna Davis, a cousin of Mrs. Shields, who came from St. Louis to assist in nursing her, and Mrs. Lee Hale, a niece of Mrs. Shields, were present when the will was delivered. Mrs. T. J. Baker, another niece, came into the room just as Mr. Ginocchio was leaving, and, seeing her aunt lying in the bed with the envelope in her hand, asked her what she wanted done with it, to which Mrs. Shields replied that she wanted it put in the drawer of her dresser in the room. Mrs. Baker thereupon took the envelope containing the two wills, and, procuring the key from a dressing table nearby, unlocked the dresser drawer, put the envelope in it, locked the drawer, and placed the key back where she got it. In the same drawer in which the envelope containing the two wills was placed, the testatrix kept other papers, her jewelry, and pocketbook. Mrs. Davis, Mrs. Hale, and Mrs. Baker had access to this drawer and would open it to get money out of the pocketbook at Mrs. Shields' request. Mrs. Davis and Mrs. Hale testified that about 10 days after the will had been delivered to Mrs. Shields, A. V. Combs, Sr., had a conversation with them in the kitchen in which he told them he was going to get his mother's will and jewelry out of the dresser drawer and put them in the bank. Mrs. Davis testified as follows:

"Well, one day Mrs. Frank Hale and myself was sitting in the kitchen eating, and Miss McKinney was in the room with Mrs. Shields, and Mr. Combs came through the kitchen and stopped and talked with us, and started out the back door, and he hesitated and came back and he said, 'Listen, I am going to take mother's will and her jewelry and put it in the Bank of Commerce for safe-keeping,' and we both agreed with him. * * * The next day, some time between nine and ten, Mrs. Hale and I were in the kitchen also, and Miss McKinney was in the room looking after Mrs. Shields, and I don't know what made me, but I stepped into the bedroom to

see if Mrs. Shields was all right, and Mr. Combs had the dresser drawer open removing some things from the drawer, and I just glanced at him, as I understood already what he said he was going to do, and said nothing to him, and I glanced over at Mrs. Shields and she was lying quiet with her back turned to Mr. Combs, and Miss McKinney was right there at the foot of the bed busy working and paying no attention. * * * He was removing the papers and jewelry from the drawer.''

She further testified that she did not see the envelope containing the will after that, although she had seen it in the dresser drawer daily up until that time. Mrs. Hale did not see appellant take the will from the dresser drawer, but she corroborated Mrs. Davis as to his conversation with them in the kitchen in which he said he was going to take the will and jewelry to the bank. She also testified that after this conversation the will was missing from the dresser drawer. Appellant admitted that he opened the dresser drawer on December 24, 1934, but stated that he removed only the jewelry, which he took to the Bank of Commerce for safekeeping. He also testified that about 4 or 5 days after the will had been delivered he opened the dresser drawer, took out the envelope containing the will, broke the seals thereon, removed the will, read it to his mother, and replaced it in the drawer. No one was in the room at the time except appellant and his mother. Miss Elizabeth McKinney, who nursed Mrs. Shields from the latter part of September until her death in December, testified that she was in the room when appellant took the jewelry from the drawer to take it to the bank. She said that he did so at Mrs. Shields' direction, and that Mrs. Davis was not present. She said this transaction occurred two or three weeks before Mrs. Shields' death. Both Mrs. Hale and Mrs. Davis testified that subsequent to December 1, Mrs. Shields was never left alone, and that at least one of the four women in attendance was always in the room night and day.

A. V. Combs, Jr., son of appellant and father of the three infant appellees, testified that he was a professional dancer, and, because of his engagements in various sections of the country, spent little time in Lexington. He visited at his grandmother's home in September, 1934, and returned December 2, 1934, and remained until about the middle of December when he

went to Florida. He returned to Lexington a few days before his grandmother's death. He admitted that he went to Mr. Ginocchio's office in September, and asked for his grandmother's will, but stated that he did so at her request. He made another trip to the attorney's office about a week later and again asked for the will, and told Mr. Ginocchio that his grandmother was worried about the will she had made because she did not want the boys' mother to benefit by it. He stated that Mr. Ginocchio said: "I will advise you, for your own benefit, not to have the will changed." Mr. Ginocchio, in rebuttal, denied that any such conversation took place. A. V. Combs, Jr., further testified that "between December 15 and 17," and "between five and seven o'clock in the evening," he went into his grandmother's room when no one was present, and, at her direction, took the will out of the drawer and handed it to her. She tore it and handed it to him, and told him to destroy it. His testimony at this point follows:

> "A. I started to tear it across like this (indicating) when she said for me to destroy it, but she said 'No, son, you had better burn it,' and I asked her if that was what she wanted me to do, and she said that was what she wanted, and that is just what I did.

> "Q. Is that what you did with it? Where did you burn it? A. Yes, I took it out in the back yard and burned it. There is an old iron can out there that has been there for years and that is where I burned it."

He stated that he did not read the will and did not know what it contained. Several days after Mrs. Shields' death he was present when his father, the appellant, took the things out of the dresser drawer, but appellant said nothing about the missing will although he knew it had been in the drawer. His son said nothing to him about having destroyed the will; his explanation being that his grandmother had instructed him "not to tell it." He did not mention it to any one, even his father, until more than five months after Mrs. Shields' death, although a proceeding to have the lost paper probated as her last will had been instituted in the Fayette circuit court on February 5, 1935. He had several conversations concerning the will with his daughter, Evelyn Combs, who testified concerning one of them as follows:

"He advised me to drop the whole thing and keep out of it. He advised me that I would come out better if I would stick by my grandfather—if I would stay on his side. I asked him just what happened to the will, that if I knew that I would be satisfied to agree with any of them, but I said that if my grandmother left me anything I want it. I said to him, 'You are my father, and for the first time I am coming to you to advise me.' He said that my grandmother knew what she wanted and things were better the way they were, and that it would be better to keep out of it and out of court. I asked him what it was she, my grandmother, wanted—why the other will was not there and what happened to it, and he said that the way things were was for the best, and that he could not tell that until a later date."

Not only was the testimony of A. V. Combs, Jr., contradicted in material respects, but, when read as a whole, it bears the marks of improbability. His credibility as a witness was a matter for the jury to determine, and if they saw fit to disregard his testimony there was ample evidence to sustain their finding that the will of November 25, 1933, had not been destroyed by the testatrix or at her direction.

Mrs. A. T. Yager, a greatniece of Mrs. Shields, testified that she had a conversation with the testatrix in September, 1934, in which the testatrix said she had two or three wills and that she was dissatisfied with all of them, and that none of them would be of any use. An objection to this statement was sustained, and appellant insists that this was error. Any statement by the testatrix showing dissatisfaction with the existing will was competent, of course, as bearing upon the question in issue; that is, whether or not she later directed the will to be destroyed. However, the witness was later asked about the same conversation, and twice stated that Mrs. Shields seemed to be dissatisfied with her will. This was a conclusion of the witness, but it got before the jury for what it was worth. Furthermore, another witness, Mrs. Nell Hook, testified concerning a conversation she had with the testatrix in September, in which the testatrix made substantially the same statement. Under the circumstances, the error was not prejudicial.

Appellant complains that certain testimony, which he claims was incompetent, was permitted to go to the

jury. Mr. Ginocchio was asked to state the matters in which he had represented Mrs. Shields subsequent to 1926, and he stated that he had represented her in the matter of some leases, and in 1928 had been employed by her to represent her grandson, A. V. Combs, Jr., in the Fayette circuit court where he was under indictment for child desertion. The appellees moved to exclude his testimony with reference to any specific employment, and the motion was sustained. On cross-examination, the witness was asked concerning a contract he prepared for Mrs. Shields to be signed by her, A. V. Combs, Jr., and the latter's second wife who had divorced him. He answered that he prepared the contract in July, 1928, about the time of the criminal term of court, and that her grandson had been indicted and was before the court on a child desertion charge. No motion to exclude any part of the answer was made. Complaint is made because the contract signed by Mrs. Shields, A. V. Combs, Jr., and his second wife was read to the jury, but we think it was competent as bearing upon her fixed intention to provide for her greatgrandchildren. It recited that in consideration of her great natural love and affection for her greatgrandchildren, A. V. Combs III, and George M. Combs, she agreed to furnish and provide them, until they were 16 years of age, with necessary clothing, maintenance, and board suitable to their station in life, and with the tuition charges necessary to be paid for their attendance in school, providing, however, "that if the said Annie E. Shields should depart this life during the continuance of this agreement and before her said two great-grandchildren respectively shall have arrived at sixteen years of age, leaving her last will and testament whereby provision is made for the benefit of her said two great-grandchildren commensurate with that herein assumed by her, then her agreement herein shall cease and terminate, and her estate shall be bound only to the extent of the provisions of such will." The contract tended to show that it was Mrs. Shields' intention to provide for her greatgrandchildren in her will. Complaint is also made of the testimony of Evelyn Combs concerning certain conversations with her father, A. V. Combs, Jr., but this testimony tended to show bias and interest on his part, and was competent.

In their closing arguments to the jury, counsel for the executor and the infant appellees stated that appel-

lant's son "was indicted by the grand jury for deserting his children," had married the mother of Evelyn Combs and deserted her, and was "a worthless no-account dancer," and it is argued that these statements were improper. While severe, the statements of facts and the deductions therefrom were authorized by the evidence. In any event, even if it be conceded that the attorneys in their argument went beyond the bounds of propriety, their conduct, under the circumstances, was not prejudicial.

Mr. Strother Kiser, the guardian ad litem of the three infant appellees, was allowed $1,200 for his services, and Mr. S. S. Yantis, attorney for the executor, was allowed a fee in the sum of $2,000, and it is insisted that these allowances are excessive. The record discloses valuable services were rendered by both the attorney for the executor and the guardian ad litem. A large amount of testimony was heard, and both the attorney for the executor and the guardian ad litem took part in the preparation of the case and in the trial. At least one deposition was taken out of the state, and numerous witnesses were interviewed. A large estate was involved, and the attorneys were successful in preserving it for appellees. In view of the labor involved and the result achieved, the allowances are not excessive.

The judgment is affirmed.

Whole court sitting.